# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>GS CALTEX CORPORATION,<br>HANJIN TRANSPORTATION CO., LTD.,<br>and SK ENERGY CO., LTD.<br><br>*Defendants*. | CASE NO. 2:18-cv-1456 |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgments submitted for entry in this civil antitrust proceeding.

## I.     NATURE AND PURPOSE OF THE PROCEEDING

On November 14, 2018, the United States filed a civil antitrust complaint against Defendants GS Caltex Corporation ("GS Caltex"), Hanjin Transportation Co., Ltd. ("Hanjin"), and SK Energy Co., Ltd. ("SK Energy") alleging that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1. From at least March 2005 and continuing until at least October 2016 ("the Relevant Period"), Defendants and their co-conspirators conspired to fix prices and rig bids for the supply of fuel to the U.S. military for its operations in South Korea. As a result of this illegal conduct, Defendants and their co-conspirators overcharged American taxpayers by

well over $100 million.  Defendants have agreed to plead guilty to an information charging a criminal violation of Section 1 of the Sherman Act for this unlawful conduct; in this parallel civil action, the United States seeks compensation for the injury it incurred as a result of the conspiracy.

At the same time the Complaint was filed, the United States also filed agreed-upon proposed Final Judgments that would remedy the violation by having GS Caltex, Hanjin, and SK Energy pay $57,500,000, $6,182,000, and $90,384,872, respectively, to the United States.  These payments resolve all civil claims of the United States related to the conduct described in the Complaint.  The United States and Defendants have stipulated that the proposed Final Judgments may be entered after compliance with the APPA.  Entry of the proposed Final Judgments would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgments and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. Defendants

GS Caltex is an oil company headquartered in Seoul, South Korea.  GS Caltex is a joint venture between GS Energy, a South Korean corporation, and Chevron Corp., a Delaware corporation, which each own a 50 percent interest in GS Caltex.  GS Caltex is engaged in the refining and supply of gasoline, diesel, kerosene, and other petroleum products for sale internationally.  During the time of the conspiracy, GS Caltex supplied fuel to U.S. military installations in South Korea.

Hanjin is a global transportation and logistics company based in Seoul, South Korea. Hanjin is a member of Hanjin Group, a South Korean conglomerate with U.S. subsidiaries, including Hanjin International America.  Beginning in 2009, Hanjin partnered with oil

companies, including a co-conspirator oil company ("Company A"), to supply fuel to U.S. military installations in South Korea.

SK Energy is an oil company headquartered in Seoul, South Korea. SK Energy is engaged in the refining and supply of gasoline, diesel, kerosene, and other petroleum products for sale internationally. During the time of the conspiracy, SK Energy supplied fuel to U.S. military installations in South Korea.

Other persons, not named as defendants in this action, participated as co-conspirators in the violation alleged in the Complaint and performed acts and made statements in furtherance thereof. These co-conspirators included, among others, a logistics firm ("Company B") and an oil company ("Company C") that jointly supplied fuel to the U.S. military.

### B. PC&S and AAFES Contracts

The United States military procures fuel for its installations in South Korea through competitive solicitation processes. Oil companies, either independently or with a transportation company, submitted bids in response to these solicitations.

The conduct at issue in this action relates to two types of contracts to supply fuel to the U.S. military in South Korea: Post, Camps, and Stations ("PC&S") contracts and Army and Air Force Exchange Services ("AAFES") contracts.

PC&S contracts are issued and administered by the Defense Logistics Agency ("DLA"), a combat support agency of the U.S. Department of Defense. The fuel procured under PC&S contracts is used to power military vehicles and heat U.S. military buildings. During the Relevant Period, DLA issued PC&S solicitations listing the fuel requirements for installations across South Korea, with each delivery location identified by a separate line item. Bidders submitted initial bids, offering a price for each line item on which they chose to bid. After DLA

reviewed the initial bids, bidders were allowed to submit revised final bids. DLA reviewed the bids and awarded contracts to the bidders offering the lowest price for each line item. Payments under the PC&S contracts were wired to the awardees by a finance and accounting agency of the U.S. Department of Defense from its office in Columbus, Ohio.

AAFES is an agency of the Department of Defense headquartered in Dallas, Texas. AAFES operates official retail stores (known as "exchanges") on U.S. Army and Air Force installations worldwide, which U.S. military personnel and their families use to purchase everyday goods and services, including gasoline for use in their personal vehicles. AAFES procures fuel for these stores via contracts awarded through a competitive solicitation process. In 2008, AAFES issued a solicitation that listed the fuel requirements for installations in South Korea. Bidders submitted bids offering a price for each line item in the solicitation. Unlike DLA, AAFES awarded the entire 2008 contract to the bidder offering the lowest price across all the listed locations.

### C. The Alleged Violation

The Complaint alleges that Defendants and their co-conspirators engaged in a series of meetings, telephone conversations, e-mails, and other communications to rig bids and fix prices for the supply of fuel to U.S. military installations in South Korea under several PC&S and AAFES contracts.

First, the Complaint alleges that GS Caltex, SK Energy, and Companies B and C conspired to rig bids and fix prices on the contracts issued in response to DLA solicitations SP0600-05-R-0063 and SP0600-05-R-0063-0001 ("2006 PC&S contracts"). The term of the 2006 PC&S contracts covered the supply of fuel from February 2006 through July 2009.

The Complaint alleges that between early 2005 and mid-2006, GS Caltex, SK Energy,

and other conspirators met multiple times and exchanged phone calls and e-mails to allocate the line items in the solicitations for the 2006 PC&S contracts. Through such communications, these conspirators agreed to inflate their bids to produce larger profit margins. For each line item allocated to a different co-conspirator, the other conspirators agreed not to bid or to bid high enough to ensure that they would not win that item. DLA awarded the 2006 PC&S line items according to the allocations made by the conspiracy.

Second, the Complaint alleges that, as part of their discussions related to the 2006 PC&S contracts, GS Caltex and other conspirators agreed not to compete with SK Energy in bidding for the June 2008 AAFES solicitation ("2008 AAFES contract"). The initial term of the 2008 AAFES contract ran from July 2008 to July 2010; the contract was later extended through July 2013.

Third, the Complaint alleges that Defendants and other co-conspirators conspired to rig bids and fix prices for the contracts issued in response to DLA solicitation SP0600-08-R-0233 ("2009 PC&S contracts"). Hanjin and Company A joined the conspiracy for the purpose of bidding on SP0600-08-R-0233. The term of the 2009 PC&S contracts covered the supply of fuel from October 2009 through August 2013.

The Complaint explains that between late 2008 and mid-2009, Defendants and other co-conspirators met multiple times and exchanged phone calls and e-mails to allocate the line items in the solicitation for the 2009 PC&S contracts. As in 2006, these conspirators agreed to bid high so as to not win line items allocated to other co-conspirators. The original conspirators agreed to allocate to Hanjin and Company A certain line items that had previously been allocated to the original conspirators.

Finally, the Complaint alleges that Defendants and other co-conspirators once again

conspired to rig bids and fix prices for the contracts issued in response to DLA solicitation SP0600-12-R-0332 ("2013 PC&S contracts"). The term of the 2013 PC&S contracts covered the supply of fuel from August 2013 through July 2016.

The Complaint explains that Defendants and other co-conspirators communicated via phone calls and e-mails to allocate and set the price for each line item in the solicitation for the 2013 PC&S contracts. Defendants and other co-conspirators believed that they had an agreement as to their bidding strategy and pricing for the 2013 PC&S contracts. As a result of this agreement, they submitted bids with pricing above what they would have offered absent collusion.

Hanjin and Company A submitted bids for the 2013 PC&S contracts below the prices set by the other co-conspirators, however. Although lower than the pricing agreed upon by the conspirators, Hanjin and Company A still submitted bids above a competitive, non-collusive price, knowing that they would likely win the contracts because the other conspirators would bid even higher prices.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENTS

For violations of Section 1 of the Sherman Act, the United States may seek damages, 15 U.S.C. § 15a, and equitable relief, 15 U.S.C. § 4, including equitable monetary remedies. *See United States v. KeySpan Corp.*, 763 F. Supp. 2d 633, 638-641 (S.D.N.Y. 2011).

This action is also related to a *qui tam* action currently filed under seal in the United States District Court for the Southern District of Ohio, alleging a violation of the False Claims Act, 31 U.S.C. § 3730, based on the same facts alleged in the Complaint.

#### A. Payment and Cooperation

The proposed Final Judgments require GS Caltex, Hanjin, and SK Energy respectively to

pay $57,500,000, $6,182,000, and $90,384,872 to the United States within 10 business days of entry of the Final Judgment. These payments will satisfy all civil claims arising from the events described in Section II *supra* that the United States has against the Defendants under Section 1 of the Sherman Act and under the False Claims Act. The resolution of the United States' claims under the False Claims Act is set forth in separate agreements reached between the Defendants, the U.S. Attorney's Office for the Southern District of Ohio, and the U.S. Department of Justice's Civil Division. *See* Attachment 1 to each of the proposed Final Judgments.

As a result of the unlawful agreements in restraint of trade between Defendants and their co-conspirators, the United States paid more for the supply of fuel to U.S. military installations in South Korea than it would have if the companies had engaged in fair and honest competition. Defendants' payments under the proposed Final Judgments fully compensate the United States for losses it suffered and deprive Defendants of the illegitimate profits they gained as a result of the collusive bidding. In addition to the payment of damages, the proposed Final Judgments also require the Defendants to cooperate with the United States regarding any ongoing civil investigation, trial, or other proceeding related to the conduct described in the Complaint. To assist with these proceedings, Defendants are required to provide all non-privileged information in their possession, make available their present employees, and use best efforts to make available their former employees, for interviews or testimony, as requested by the United States. This cooperation will help the United States pursue compensation from co-conspirators not named in this action.

Under Section 4A of the Clayton Act, the United States is entitled to treble damages for injuries it has suffered as a result of violations of the Sherman Act. Under the proposed Final Judgments, each Defendant will pay an amount that exceeds the overcharge but that reflects the

value of the cooperation commitments the Defendants have made as a condition of settlement and the cost savings realized by avoiding extended litigation.

The proposed Final Judgments also require each Defendant to appoint an Antitrust Compliance Officer and to institute an antitrust compliance program. Under the antitrust compliance program, employees and directors of Defendants with responsibility for bidding on contracts with the United States must undergo training and all employees must be informed that there will no reprisal for disclosing to the Antitrust Compliance Officer any potential violations of the United States antitrust laws. The Antitrust Compliance Officer is required annually to certify that Defendant is in compliance with this requirement.

### B. Enforcement of Final Judgments

The proposed Final Judgments contain provisions designed to promote compliance and make the enforcement of Division consent decrees as effective as possible. Paragraph VII(A) provides that the United States retains and reserves all rights to enforce the provisions of the proposed Final Judgments, including its rights to seek an order of contempt from the Court. Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgments, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that the Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.

Paragraph VII(B) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgments. The proposed Final Judgments were drafted to

restore all competition the United States alleged was harmed by the Defendants' challenged conduct. The Defendants agree that they will abide by the proposed Final Judgments, and that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgments that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph VII(C) further provides that should the Court find in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate. In addition, in order to compensate American taxpayers for any costs associated with the investigation and enforcement of violations of a proposed Final Judgment, Paragraph VII(C) provides that in any successful effort by the United States to enforce a Final Judgment against a Defendant, whether litigated or resolved before litigation, Defendants agree to reimburse the United States for any attorneys' fees, experts' fees, or costs incurred in connection with any enforcement effort, including the investigation of the potential violation.

Finally, Section VIII of the proposed Final Judgments provide that each Final Judgment shall expire seven years from the date of its entry, except that after five years from the date of its entry, a Final Judgment may be terminated upon notice by the United States to the Court and the Defendant that the continuation of that Final Judgment is no longer necessary or in the public interest.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Entry of the proposed Final Judgments will neither impair nor assist the bringing of any private antitrust damages action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgments have no prima facie effect in any subsequent

9

lawsuit that may be brought against Defendants.

V.     **PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENTS**

The United States and Defendants have stipulated that the proposed Final Judgments may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgments are in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgments within which any person may submit to the United States written comments regarding a proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States, which remains free to withdraw its consent to a proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the Antitrust Division's internet website and, in certain circumstances, published in the Federal Register.

Written comments should be submitted by mail to:

>Kathleen S. O'Neill
>Chief, Transportation, Energy & Agriculture Section
>Antitrust Division
>United States Department of Justice
>450 5th Street, NW, Suite 8000
>Washington, DC 20530

The proposed Final Judgments provide that the Court retains jurisdiction over this action, and the parties may apply to the Court for any necessary or appropriate modification, interpretation, or enforcement of a Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENTS

The United States considered, as an alternative to the proposed Final Judgments, a full trial on the merits against Defendants. The United States is satisfied, however, that the relief in the proposed Final Judgments remedies the violation of the Sherman Act alleged in the Complaint. The proposed Final Judgments represent substantial monetary relief while avoiding the time, expense, and uncertainty of a full trial on the merits. Further, Defendants' agreements to cooperate with the civil investigation and any potential litigation will enhance the ability of the United States to obtain relief from the remaining conspirators.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENTS

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

>(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief

11

> sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. Hillsdale Cmty. Health Ctr.*, 2015 U.S. Dist. LEXIS 162505, at *3 (E.D. Mich. 2015) (explaining that the "Court's review is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

Under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the decree is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62; *United States v. Medical Mut. of Ohio*, 1998 U.S. Dist. LEXIS 21508, at *2-3 (N.D. Ohio 1998). With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981));

*see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[1]

In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also United States v. U.S. Airways Group, Inc.*, 38 F. Supp. 3d 69, 74 (D.D.C. 2014) (noting that a court should not reject the proposed remedies because it believes others are preferable and that room must be made for the government to grant concessions in the negotiation process for settlements); *United States v. Dairy Farmers of Am., Inc.*, 2007 U.S. Dist. LEXIS 33230, at *3 (E.D. Ky. 2007) (citing *United States v. Microsoft*, 231 F. Supp. 2d 144, 152 (D.D.C. 2002)) (noting that a court "must accord deference to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant "due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its

---

[1] *See also BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

views of the nature of the case"). The ultimate question is whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990)). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60; *see also Dairy Farmers*, 2007 U.S. Dist. LEXIS 33230 at *3 (citing *Microsoft* favorably). As the United States District Court for the District of Columbia confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments,[2] Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11. A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *U.S. Airways*, 38 F. Supp. 3d at 76. *See also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: November 14, 2018

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

　　/s  Andrew M. Malek　　
Andrew M. Malek (Ohio Bar #0061442)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Tel: (614) 469-5715
Fax: (614) 469-2769
E-mail: Andrew.Malek@usdoj.gov

　　/s  J. Richard Doidge　　
J. Richard Doidge
Attorney
U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 8000
Washington, DC 20530
Tel: (202) 514-8944
Fax: (202) 616-2441
E-mail: Dick.Doidge@usdoj.gov

# CERTIFICATE OF SERVICE

I, Andrew Malek, hereby certify that on November 14, 2018, I caused a copy of the foregoing Competitive Impact Statement to be served on GS Caltex Corporation, Hanjin Transportation Co., Ltd., and SK Energy Co., Ltd. by mailing the document first-class, postage prepaid, to the duly authorized legal representatives of the defendants, as follows:

For GS Caltex Corporation
Marguerite M. Sullivan
Latham & Watkins LLP
555 Eleventh Street, NW
Washington, DC 20004
Tel: (202) 637-1027
Fax: (202) 272-3602
E-mail: marguerite.sullivan@lw.com

For Hanjin Transportation Co., Ltd.
William H. Stallings
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3807
Fax: (202) 263-3300
E-mail: wstallings@mayerbrown.com

For SK Energy Co., Ltd.
Phillip H. Warren
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Tel: (415) 591-7012
Fax: (415) 955-6512
E-mail: pwarren@cov.com

                                                BENJAMIN C. GLASSMAN
                                                United States Attorney

                                                s/ Andrew M. Malek
                                                ANDREW M. MALEK (0061442)
                                                Assistant United States Attorney
                                                303 Marconi Boulevard, Suite 200
                                                Columbus, Ohio 43215
                                                Tel: (614) 469-5715
                                                Fax: (614) 469-2769
                                                E-mail: Andrew.Malek@usdoj.gov